[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 1927
Plaintiff brings this action in one count for defendant's failure to pay two sets of credit card bills under a written credit card agreement. Defendant has filed an answer and counterclaim in three counts charging, basically, that plaintiff failed to protect defendant on his credit card charges. Plaintiff has filed a reply to defendants' counterclaim together with three special defenses.
 Facts
In 1991 plaintiff and defendant entered into a credit card agreement, (Agreement). That Agreement was still in effect through September 1995. Under that Agreement defendant was a cardmember. The Agreement allows the cardmember to request a second card for others.
Originally one card was issued to defendant and sometime in early 1995 or late 1994 defendant was approached by a friend from the former Soviet Union named Vladislav Karkover (Karkover) and asked if defendant would add a person named Alexandre Bouzykana (Bouzykana) to the card as a secondary authorized user. At defendant's request, a second card was issued to Bouzykana. The second card, called an Authorized User card (A. U. Card), was sent by mail to defendant. Under the Agreement, defendant was liable for all claims on the A. U. Card. Upon receipt of a small fee from Kharkover defendant sent the A. U. Card to Kharkover for the use of Bouzykana.
That secondary user, Bouzykana had the secondary card for several months but used it to make only three purchases, in Russia, in January 1995, totaling $182.81. Kharkover obtained a copy of that monthly card bill from the defendant and paid for the Bouzykana secondary card charges. At Kharkover's request, Bouzykana was removed from the card account as a secondary authorized user on February 6, 1995.
In April 1995, the Defendant was approached again by Kharkover, and asked if he would add a person named Alexei Popov ("Popov"), to the card as a secondary authorized user of his card. The plaintiff did not know Popov personally, never spoke to or corresponded with Popov, and could not identify him. Plaintiff had no contractual relationship with Popov. The plaintiff has CT Page 1928 never had a record signature exemplar known to be the signature of Popov; his address or telephone number; a physical description of him; a copy of a driver's license for Popov; a copy of a passport or a German tourist visa issued for Popov. There is no evidence that defendant either requested or received any of the above from anyone.
On April 14, 1995, with the defendant's consent, Popov was added to the card account as a secondary authorized user, in consideration for a payment from Kharkover to the defendant of $25.00 per month and on condition that Kharkover would pay for any charges may by Popov. The defendant's father had had a similar arrangement with Kharkover. Kharkover actually had begun a business of providing credit cards to persons.
The card member is obligated to notify plaintiff if any of his cards are lost or stolen and then plaintiff can block the use of such card. At that point the card member is no longer liable for charges thereafter made on that card. Without the card member's notice the plaintiff cannot block use of the card.
Defendant gave Kharkover a copy of his Social Security Card and all the information about defendant necessary for Kharkover to pass plaintiffs verification system for telephone call messages and responses.
Defendant knew that there could be charges made in excess of his credit limit but he relied on Kharkover to be responsible for all charges on the A. U. Card.
Under the Agreement plaintiff could change the credit limit at any time at its discretion. The defendant never requested an increase in the credit limit on the card.
The Agreement further provides, "The total amount charged on your account, including purchases, cash advances, finance charges, fees, or other charges, must always remain below your credit line." The cards were subject to VisaInternational Operating Guidelines published by VisaInternational and subscribed to by the plaintiff, a VisaInternational member bank which establish "floor limits" on the use of Visa cards all over Europe and the United States. They do not concern cash advances. For all cash advances the user must go to a bank and submit to identification procedures. CT Page 1929
The VisaInternational Operating Guidelines are marked with a warning which reads, "NOTICE: The information furnished herein by Visa is CONFIDENTIAL and is distributed to Visa Members for their exclusive used in operating their Visa sponsored programs, and shall not be duplicated, published or disclosed in whole or in part without the prior written permission of Visa." For a transaction in an amount below a floor limit, a merchant does not need to obtain authorization to charge the transaction to a customer's VISA card account. The plaintiff never told defendant about those floor limits.
At all relevant times, the floor limit in Germany for VISA Classic card transactions generally (under the category of "All Other Merchants") was 500 Deutsch marks (DM) or about $355.
Many of the charges were in the amount of DM 499 and the US dollar equivalents shown therein.
After Popov became the secondary authorized user of the card account, one transaction was made in Russia using the secondary card, in the amount of $1.95 on May 10, 1995. That was the only transaction made in April, May or June 1995 using the secondary card issued to Popov. The balance on the defendant's card account at the beginning of July 1995 was zero.
On July 18, 1995, there were 13 purchases and one cash advance, totaling $2,744.82. That cash advance request was made using the A.U. Card in Germany on July 18, 1995 and a passport was presented for identification. That request was honored. The court infers that passport was more probably than not in the name of Popov because the A. U. Card presented was in that name and the request was honored.
Between July 18, 1995 and July 28, 1995, someone using the secondary card issued by the plaintiff to Popov made 159 purchases and the one cash advance referred to above. All were in Germany, totaling US $36,076.66. All those transactions were under the applicable VISA International Floor Limits of DM 500 and thus merchant verification was not required. Neither the plaintiff nor the defendant were aware of any of the 159 transactions charged to the secondary card until after the monthly statement was issued on August 18, 1995.
The plaintiff did not report any of those transactions to the defendant because under the merchant floor limits, to which the CT Page 1930 plaintiff had subscribed, this kind of activity was not reported to plaintiff until the time for billing. On that same day four other attempts were made in Germany between 7:40 and 9:22 a.m. (local Sioux Falls, South Dakota time) to withdraw cash advances using the A.U. Card, which were declined. They were no doubt declined because the amounts requested were over defendant's credit or cash advance limits. At all relevant times the cards had a credit limit of $900 and a cash advance limit of $600.
The Agreement anticipated that the credit limit would be exceeded by the cardholder and provided a small penalty for such action. This provision does not distinguish between deliberate and accidental exceedences.
The credit limit on any Citibank VISA card also could be exceeded as the result of the conduct of a merchant, when, for example, a merchant does not have a machine through which to "swipe" the card to get an automated approval or authorization, or the merchant's machine is not working or, in either case, the merchant neglects or fails to call Citibank for approval or authorization.
There is no evidence that defendant himself ever made a charge which exceeded the credit line on the cards during the relevant period.
On July 19, 1995, an additional cash advance was requested and it was declined by Citibank. An individual then called Citibank Customer Service, identified himself as Alexei Popov, passed Citibank's verification procedures and lodged a complaint about Citibank's refusal to honor the cash advances.
The plaintiff does not know when or how it found out about the attempted cash advances; exactly where in Germany the attempts were made; whether the attempts were made at a bank, automated teller machine or retail store; or how the plaintiffs own Fraud Early Warning system became aware of the attempts.
On July 19, 1995, there were 10 more purchases made in Germany using the A.U. card, totaling $2,535.08.
On July 20, 1995, there were 27 more purchases made in Germany using the A.U. card totaling $5,670.73.
On July 20, 1999 the plaintiff called the defendant to inform CT Page 1931 him of those July 18, 1995 cash advance attempts and placed a Fraud Early Warning code on defendant's account. Gifesman passed Citibank's verification procedures and confirmed that Popov was an authorized user. Citibank asked Gifesman if it should block the use of the secondary account. Gifesman specifically instructed Citibank not to block Popov's use of the card.
Plaintiff did tell defendant that those attempts were made with the A.U. card in Europe but that those attempts had occurred in Germany was not specified.
The representative of the plaintiff told the defendant that the value of the cash advance attempts made had been in the thousands, but that there was a question about the conversion rate of foreign currency to US dollars. Plaintiff did not know whether the "thousands" in declined cash advance attempts were in Russian rubles, Deutsche marks or US dollars
At the time of that conversation the plaintiff did not yet know about the 51 other transactions made with the secondary A.U. card on July 18, 19 and 20, 1995, totaling $10,950.63. Thus, the representative of the plaintiff did not tell the defendant about those at that time. During the conversation with the defendant in regard to whether defendant wanted to block use of the A.U. card and the defendant said he did not. Defendant also said he would check and call back but he never did call back.
It did not really matter to defendant whether cash advances were declined or honored because Kharkover would pay the A.U. card debts.
If defendant had known about the 51 other transactions he might have reacted differently about blocking the card.
The defendant related to Kharkover what he had been told by the plaintiff about the declined cash advance attempts and Kharkover told him not to worry. On July 21, 1995, there were two more purchases made in Germany using the A.U. card, totaling $202.29. The plaintiff contacted the defendant by telephone again on that day, July 21, 1995, to find out again if he wanted to block the Card, but did not tell him any information in addition to that communicated the day before.
On July 22, 1999, there were no new charges made using the A.U. card, but the plaintiff recorded the card as possibly lost or CT Page 1932 stolen and sent a letter to defendant asking him about the A.U. card being lost or stolen.
On July 23, 1995, there were four more purchases made in Germany using the A.U. card, totaling $351.19.
On July 24, 1995, there were 25 more purchases made in Germany using the A.U. card, totaling $6.152.08.
Also on July 24, 1995, the A.U. card was used in Germany to try to withdraw a cash advance of $43,628.49. This attempt was declined. The plaintiff did not inform the defendant that it had occurred.
On July 25, 1995, there were 19 more purchases made in Germany using the A.U. card, totaling $3,511.17.
On July 26, 1995, there were 18 more purchases made in Germany using the A.U. card, totaling $3,515.79.
On July 27, 1995, there were 20 more purchases made in Germany using the A.U. card, totaling $5,671.05.
On the final day, July 28, 1995, there were 20 more purchases made in Germany using the A.U. card, totaling $5,707.86.
Every one of the 159 purchases made in Germany using the A.U. card in July 1995 was under the floor limit of DM 500.
The floor limits apply only to each individual purchase, so that although many of the purchases made in Germany using the A.U. card were made at one department store, including multiple purchases on the same day those purchases did not exceed the floor limit.
On each day of the A.U. card use in Germany, the plaintiff did not inform the defendant of the activity, except in regard to the cash advances, because the plaintiff did not know of that activity.
The plaintiff cannot document the form or forms of identification which were presented by the person who withdrew the one cash advance which was approved on July 18, 1995, in the amount of $364.93. It cannot identify where the advance was made or who made it. CT Page 1933
The plaintiff has been able to obtain copies of the transaction receipts for 31 of the 159 purchases which were made in Germany using the secondary card. The signatures on those 31 receipts look similar to each other. The plaintiff cannot read any of the signatures, cannot determine in what language they were written, does not know if they consist of one word or two words, and does not know if they represent a first name, at last name, an initial or something else. The plaintiff has not seen the receipts for the 128 other transactions made in Germany using the A.U. card, and has no idea who signed them or whether the signatures on them would be similar to those on the 31 receipts.
The plaintiff at all times dealt with Defendant in a commercially reasonable manner.
The defendant has failed to sustain his burden of proof on his counterclaim.
The defendant did not act in a commercially reasonable manner. He was negligent in allowing some total stranger to use the A.U. card merely on Karkhover's assurances, and payment of $25 per month. Plaintiff has made demand for the amount now due under the Popov A.U. card but defendant has failed to pay any of that amount.
Judgment for plaintiff on the counterclaim.
Judgment for plaintiff on the complaint for $48,825.37 plus attorney's fees of $7000.
N. O'Neill, J.